IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,           )
                                    )
                 Plaintiff,         )
                                    )
v.                                  )        No. 3:24-CR-64-KAC-JEM
                                    )
ENJOLI CARTER,                      )
                                    )
                 Defendant,         )

**ORDER OF DETENTION**

This case is before the undersigned on an amended petition by the United States Probation

Office [Doc. 312] and a motion by the Government [Doc. 337] to revoke Defendant Enjoli Carter's

pretrial release. *See* 28 U.S.C. § 636(b). Defendant Carter responded in opposition [Doc. 338].

The Grand Jury charged Defendant by Superseding Indictment with conspiring to distribute

400 grams or more of a substance containing fentanyl (Count One); conspiracy to commit money

laundering (Count Three); and possession with intent to distribute 400 grams or more of a

substance containing fentanyl, aided and abetted (Count Four) [Doc. 109 pp. 1–3]. Defendant first

appeared in the Eastern District of Michigan on October 23, 2025, and following a detention

hearing, United States Magistrate Judge Anthony P. Patti released Defendant on conditions,

including that he not violate any federal, state, or local law; advise his supervising officer in writing

before changing his address; avoid all contact with witnesses in the investigation or prosecution

of his case; and resolve all outstanding warrants [Doc. 204 pp. 7–10]. On October 30, 2026,

Defendant appeared in this district [Doc. 207, Minutes], and the undersigned permitted his release

on the same conditions, adding that he maintain or actively seek employment [Doc. 208 p. 2].

The Government now asks the Court to revoke Defendant's pretrial release, asserting that

he has committed federal crimes, specifically threatening a witness in violation of 18 U.S.C.

§ 1512 and retaliating against a witness in violation of 18 U.S.C. § 1513 [Doc. 337 p. 3]. It asserts that Defendant sent threatening messages on Facebook Messenger to his cousin A.C. stating that he would kill or fight A.C. [*Id*. at 4]. According to the Government, Defendant also posted a photo of A.C. on Facebook linked with rat emojis and called A.C. a rat [*Id*.]. The Government also alleges Defendant violated his conditions by communicating with a known witness [*id*. at 6], staying with his girlfriend from March 18 through April 22, 2026, rather than at his "bond address," which is his sister's residence [*id*.]; failing to resolve an outstanding warrant or to appear in state court for trial on April 1, 2026 [*id*. at 7]; and working only intermittently for DoorDash [*id*.]. Defendant argues the Government's allegations are "unproven," and he asks the Court to return him to pretrial release on the same conditions with the additional special condition that he have no contact with A.C. or A.C.'s father J.C. [Doc. 338 pp. 3, 9–11].

The parties appeared before the undersigned on June 22, 2026, for a revocation hearing. Assistant United States Attorney Cynthia F. Davidson appeared on behalf of the Government. Attorneys David M. Eldridge and Sharon Leveron represented Defendant Carter, who was also present. The Court has considered the proffers, exhibits and arguments of the parties. For the reasons stated herein, Defendant's pretrial release is **REVOKED**, and Defendant Carter is **DETAINED** pending further proceedings in this case.

## I.     BACKGROUND AND EVIDENCE FROM REVOCATION HEARING

On April 16, 2026, the undersigned issued an arrest warrant for Defendant based upon a Petition for Action on Conditions of Release submitted by Defendant's supervising officer in this district, United States Probation Officer Katelyn Adams Walker [Doc. 296]. As explained by District Judge Katherine A. Crytzer:

> That Petition alleges "under penalty of perjury" that Defendant "has been posting threatening messages on Facebook" toward a potential witness

2

and "has threatened to drive to Arkansas" with an accomplice to kill the potential witness and harm the potential witness's family. Judge McCook ordered that a "warrant be issued, and a hearing be scheduled for the Court to determine why the defendant's bond supervision should not be revoked."

Defendant was arrested on the Petition, and he appeared before a magistrate judge in the Eastern District of Michigan on April 29. The United States sought Defendant's detention at that hearing. Under Federal Rule of Criminal Procedure 40, the Eastern District of Michigan magistrate judge released Defendant on his prior conditions and bond, except that she added a new condition that he "reside at the bond address" and a "zero tolerance" warning.

On April 29, [Judge Crytzer] stayed the release order until the Court had the opportunity to adjudicate the United States's impending motion to revoke the release order.

[Doc. 334 pp. 1–2 (citations omitted)]. Judge Crytzer later detained Defendant pending the outcome of the revocation proceedings [Doc. 334 pp. 1–2].

On April 30, 2026, the undersigned issued an arrest warrant for Defendant based upon an Amended Petition for Action on Conditions of Release submitted by Defendant's supervising officer in this district, Officer Walker [Doc. 312]. In the petition, Officer Walker alleges that "[o]n April 14, 2026, [she] received information from [AUSA] Davidson indicating that the Federal Bureau of Investigation (FBI) in Detroit, Michigan, received information on FBI National Threat Operations Center (NTOC) tipline that [D]efendant Carter has been threatening a potential witness in the prosecution of this case . . . [by] posting threating messages on Facebook toward [J.C.] and his son [A.C.] and has threatened to drive to Arkansas with his cousin Lamar Mount, and kill [A.C.] and his mother as well as [to] harm [J.C.] who resides in Texas" [Doc. 312 p. 3].

In addition, Officer Walker alleges that Defendant did not stay at his court-approved residence with his sister from March 18 through April 22, 2026 [*Id.* at 3]. She contends that Defendant admits he stayed overnight with his girlfriend at her residence in Section 8 housing during that time [*Id.*]. Officer Walker also asserts that Defendant's supervising officer in Michigan

told him to resolve five outstanding warrants, but he has yet to resolve one of the warrants, failed to appear for trial in Michigan state court on April 15, 2026, and now has four active capiases for offenses relating to lack of a driver's license and insurance [*Id*.]. Finally, Officer Walker states that Defendant failed to work as a DoorDash driver from November 3–23, 2025; December 15, 2025–January 25, 2026; or February 2–8, 2026 [*Id*. at 4].

Defendant arrived in this district after transport from the Eastern District of Michigan, and on June 9, 2026, had an initial appearance on the amended petition [Doc. 335]. At that time, the Government orally moved to revoke his pretrial release under 18 U.S.C. § 3148 [Doc. 335]. On June 12, 2026, the Government filed a written motion to revoke Defendant's pretrial release [Doc. 337]. Defendant responded in opposition [Doc. 338].

At the June 22 revocation hearing, AUSA Davidson introduced screen shots of text conversations between Defendant and his cousin A.C. from April 9 and 10, 2026, taken from A.C.'s cell phone [Govt's Exh. 1]. Defendant also introduced screenshots of text messages between Defendant and A.C. on those dates taken from Defendant's cell phone [Def. Exh. 1].

The Government proffered that Defendant sent threatening text messages to A.C. beginning on April 9, 2025. AUSA Davidson said A.C. contacted the Drug Enforcement Administration's tipline about the threats, and A.C.'s father J.C. reported the threats to the FBI. According to AUSA Davidson, the FBI interviewed A.C. and J.C. on April 17, 2026. She said that A.C. and J.C. told the FBI that Defendant learned that A.C. was a cooperating witness shortly before April 9, 2026, when A.C.'s sister told Defendant about A.C.'s cooperation because she was upset about A.C.'s contact with her son. AUSA Davidson reviewed the text messages, pointing out that Defendant made a "direct threat" to A.C. when he said, "as far as you know, I'm not a shooter." She said that Defendant's comments that A.C. had an agent on speed dial show that

4

Defendant knew A.C. was cooperating. AUSA Davidson further proffered that Defendant posted a photograph of A.C. with rat emojis and posted A.C.'s home address. She said A.C. and J.C. told the FBI they were worried about Defendant retaliating against their family members.

Mr. Eldridge proffered that Defendant and A.C. are cousins and their families grew up together in the Detroit area. He said that hostility arose between the two families and that A.C.'s father J.C. stabbed Defendant's father. He said the screen shots in Defendant's Exhibit 1 are from Defendant's Facebook Messenger feed and are in chronological order. He said prior to April 8, Defendant and A.C. had limited contact, but they exchanged a sequence of insulting, vulgar messages beginning April 8 or 9 through April 11. Mr. Eldridge reviewed the messages, pointing out that A.C. first contacted Defendant and was the first to text insults. He asserted that the insults are unrelated to any alleged cooperation by A.C. and that A.C. denies he is cooperating multiple times. Mr. Eldridge proffered that Defendant and A.C. accuse each other of being cowards and discuss fighting and that the only death threat comes from A.C. to Defendant.

Mr. Eldridge pointed out that A.C. continued to communicate with Defendant after April 9, the date the Government says A.C. contacted the DEA, and that although A.C. reported being threatened, A.C. appears to be "egging [Defendant] on" to continue the communications. Mr. Eldridge stated that Defendant says several times that he cannot leave Michigan and does not suggest that he will leave Michigan and travel to Arkansas. According to Mr. Eldridge, A.C. is the first to use the term "rat." Mr. Eldridge explained Defendant's comment about being on t-shirts refers to the custom of wearing t-shirts with photos of the deceased to a funeral and that Defendant said that both he and A.C. would be on t-shirts.

Regarding the other alleged violations, Mr. Eldridge proffered that Defendant lived with Tianna McNary and her two children for the last two years. Ms. McNary confirmed that Defendant

5

contributes to the household expenses and worked at DoorDash daily. Mr. Eldridge stated that Defendant lost his full-time employment because of his arrest in this case. He said Ms. McNary would testify that Defendant occasionally spent the night with his girlfriend at the girlfriend's residence a few blocks away but did not move his belongings to that location nor keep personal items at the girlfriend's residence. Mr. Eldridge stated that Defendant did not understand that he was required to always stay at Ms. McNary's residence and that Defendant's girlfriend, who lives in Section 8 housing, did not want the probation officer to conduct a home visit at her residence. He argued that Defendant's irregular schedule at DoorDash was characteristic of that type of work.

Regarding Defendant's outstanding warrant, Mr. Eldridge said that Defendant failed to make a Zoom court appearance because he lost the log-in credentials. He said Defendant could not rectify this situation before he was arrested on the petition.

AUSA Davidson showed a text message from the lead case agent to her on April 10, at 12:34 p.m., regarding threats to A.C., which Ms. Davidson argued confirmed that A.C. contacted authorities by April 10. She said J.C. called the FBI tipline on April 11. She stated that the log from Defendant's GPS monitor shows that Defendant did not spend a night at his court-approved residence for more than one month. AUSA Davidson said that in the text messages Defendant posted five rat emojis before A.C. first texted the word "rat." She asserted that Defendant harassed A.C. by posting to his 1500 followers that A.C. is a rat. AUSA Davidson argued that no conditions of release will ensure the safety of the community.

Mr. Eldridge argued that none of the screenshots before the Court show that Defendant posted A.C.'s home address. He stated that Defendant's failures to appear are related to traffic citations and that Defendant appeared for his arraignment in Knoxville after his arrest in Michigan. He maintained that when officers went to arrest Defendant, he was easily found. Mr. Eldridge

6

argued that Defendant should be released on his prior conditions, which include a GPS monitor, and that the Court, like the Magistrate Judge in Michigan, can give a specific instruction not to communicate with A.C. and J.C.

After hearing the parties' arguments, the undersigned took the matter under advisement.

## II.    ANALYSIS

"A person who has been released under [18 U.S.C. §] 3142 . . . and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." 18 U.S.C. § 3148(a). After a hearing, the Court shall revoke the defendant's release and detain the defendant, if it finds probable cause to believe the defendant has committed another crime while on release or clear or convincing evidence that the defendant has violated any other condition of release and the Court also finds "there is no condition or combination of conditions of release that will assure the person will not flee or pose a danger to the safety of any other person or the community" or that "the person is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b).

If the Court finds probable cause to believe that the defendant has committed a federal, state, or local felony while on release, this finding gives rise to a rebuttable presumption that no condition or combination of conditions "will assure" that the defendant is not a danger to another person or the community. *Id*. If the Court "finds that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions," then the Court may amend the conditions of release pursuant to the provisions of § 3142. *Id*.

Here, the Court finds by clear and convincing evidence that Defendant violated a condition of his pretrial release by communicating with someone who may be a witness. 18 U.S.C.

7

§ 3148(b)(1)(B). Defendant's conditions require that he "avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: codefendants" [Doc. 208 ¶ 7(g); *see* Doc. 204 p. 8]. In the forty-eight-hour period between April 9 at 8:43 a.m. and April 11 at 9:52 a.m., Defendant sent more than twenty-five private text messages[1] to A.C. on Facebook Messenger [Def. Exh. 1]. The Government asserts that Defendant knew A.C. was a cooperating witness because shortly before April 9, 2026, A.C.'s sister told Defendant that A.C. was cooperating. Defendant's knowledge that A.C. was a Government witness is corroborated by Defendant's text messages. Defendant twice asks if A.C. intends to call the "DEA agent" or the agent that A.C. has on "speed dial" [Def. Exh. 1 pp. 8, 14]. Defendant also tells A.C. that he "shouldn't volunteer all that fake a** information to the Feds . . ." [Def. Exh. 1 p. 14]. Defendant calls A.C. a "rat" and sends rat emojis [*Id*. at 11, 14]. Defendant further tells A.C., "When we get these screenshots of you . . . we gone see rat," and "Yo name don't gotta be on no paperwork just know u a rat . . ." [Govt. Exh. 1]. These comments make it clear and convincing that Defendant knew A.C. was or could be a witness, and he communicated with him directly by text message in violation of his conditions of release.[2]

The Court also finds by clear and convincing evidence that no condition or combination of conditions will assure that Defendant will not pose a danger to any person or the community. 18 U.S.C. § 3148(b)(2)(A). In reaching this conclusion, the undersigned looks to the § 3142(g) factors. *Id*. § 3148(b)(2)(A). The District Judge recently examined these factors de novo and found

---

[1] The text messages in Defendant's Exhibit 1 appear not to be all the messages between Defendant and A.C. during this two-day period because some images show only portions of the screen and the Government's Exhibit 1 contains messages by Defendant that do not appear in Defendant's Exhibit 1 [*Compare* Def. Exh. 1 *with* Govt. Exh. 1].

[2] Having found that Defendant violated his conditions of release, the undersigned need not assess whether Defendant's text messages to A.C. also constitute violations of 18 U.S.C. §§ 1512 and 1513.

all four support detention [Doc. 334 pp. 5–7]. The undersigned agrees with this analysis and finds the proffers and evidence presented at the June 22 hearing further demonstrate that Defendant is a danger. Defendant's texts show that he threatened to beat up A.C. [Def. Exh. 1 pp. 4, 13; *see also* Govt. Exh. 1]. Defendant said he knows A.C. cannot fight him because A.C. needs cancer medication and states "so you might die before me" followed by laughing emojis with tears and rat emojis [Def. Exh. 1 p. 11]. Defendant not only threatened A.C. by private message but, according to the Government's proffer, also posted A.C.'s photograph on his Facebook feed and identified A.C. as a "rat" to his 1500 followers.

Defendant argues that a modification of his conditions to expressly exclude contact with A.C. and J.C. would address any concerns about danger to others [Doc. 338 p. 11]. He maintains that this added condition would "resolve any ambiguity as to whether [A.C. and J.C.] fell into the categories of persons for which contact was prohibited" [*Id.*]. But Defendant's text messages show no such ambiguity existed. Instead, Defendant knew that A.C. was a cooperating witness, yet he messaged A.C. privately, threatened to beat him, and suggested that other family members could also assault A.C. [Def. Exh. 1 p. 6 ("u was scared of your nephew when he said he was gone beat yo a** . . .")]. These comments give the Court no confidence that the suggested modification (a specific exclusion of A.C. and J.C.), or any other combination of conditions, would suffice to protect either A.C. or the community.

## III. CONCLUSION

For the reasons stated herein, and pursuant to 18 U.S.C. § 3148, the Government's motion for revocation of pretrial release [**Doc. 337**] is **GRANTED** and Defendant's pretrial release is **REVOKED**. Defendant Carter is **ORDERED** remanded to the custody of the United States Marshal to await his trial. Defendant is committed to the custody of the Attorney General or his

designated representative for confinement in a correction facility separate, to the extent practical, from persons awaiting or serving sentences or being held in custody pending appeal. Defendant shall be afforded a reasonable opportunity for private consultations with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

**IT IS SO ORDERED**.

ENTER:

Jill E. McCook
United States Magistrate Judge

10